1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JOAQUIN MIGUEL BALASSA,                    Case No.   1:21-cv-00272-KES-HBK (HC)

12                   Petitioner,                 FINDINGS AND RECOMMENDATIONS TO
                                                 DENY PETITION FOR WRIT OF HABEAS
13           v.                                  CORPUS AND DECLINE TO ISSUE
                                                 CERTIFICATE OF APPEALABILITY [1]
14    MARTIN GAMBOA,
                                                 FOURTEEN-DAY OBJECTION PERIOD
15                   Respondent.

16

17

18    **I.     STATUS**

19           Petitioner Joaquin Miguel Balassa ("Petitioner" or "Balassa"), a state prisoner, is

20    proceeding pro se on his Amended Petition for Writ of Habeas Corpus filed under 28 U. S.C.

21    § 2254 on October 18, 2021.  (Doc. No. 20, "Petition").  Petitioner challenges his convictions

22    after a jury trial for two counts of willful, deliberate, and premeditated murder with a special-

23    circumstance that Petitioner had committed multiple murders.  (Case No. BF156910A).  (Doc.

24    No. 24-18 at 2; *see* Doc. No. 24-3 at 64-71).[2]  The Kern County Superior Court sentenced

25

26    _____

      [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
      (E.D. Cal. 2022).

27
      [2] All citations to the pleadings and record are to the page number as it appears on the Case Management
28    and Electronic Case Filing ("CM/ECF") system.

                                                    1

1  Petitioner to two consecutive terms of life in prison without the possibility of parole. (Doc. 24-
2  18 at 2; *see* Doc. 24-3 at 96).

3        On appeal, the Fifth Appellate District Court accepted the state's concessions that one of
4  the two multiple-murder special-circumstance findings and a parole revocation fine should be
5  stricken and modified the judgement accordingly. (Case No. F073733). (Doc. 24-18 at 2, 32).
6  The appellate court otherwise affirmed the judgment. (*Id.*). On May 27, 2020, the California
7  Supreme Court summarily denied Balassa's petition for review. (Case No. S261360). (Doc. No.
8  24-19).

9        The Petition presents the following (restated) grounds for relief:

10
        (1) The prosecution introduced and extensively relied on
        Petitioner's invocation of his Fourth, Fifth, and Sixth Amendment
11
        rights at trial, violating Petitioner's right to due process.

12
        (2) The trial court failed to instruct the jury that they could acquit of
        murder if they found Petitioner honestly believed he was in
13
        imminent danger of being raped.

14
        (3) The trial court's erroneous self-defense instructions removed a
        critical element from the jury's consideration, undercutting the
15
        defense and lightening the state's burden of proof.

16
        (4) The cumulative errors require reversal of Petitioner's
        conviction.
17

18  (*See* Doc. No. 20 at 5-10). Respondent filed an Answer (Doc. No. 25), arguing Petitioner was not
19  entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 24,
20  24-1 through 24-19). Petitioner did not file a traverse and the time to do so has expired. This
21  matter is deemed submitted on the record before the Court. After careful review of the record and
22  applicable law, the undersigned recommends the district court deny Petitioner relief on his
23  Petition and decline to issue a certificate of appealability.

24  **II.    GOVERNING LEGAL PRINCIPLES**

25      **A.    Evidentiary Hearing**

26        In deciding whether to grant an evidentiary hearing, a federal court must consider whether
27  such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,
28  would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

(2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Here, the state courts adjudicated Petitioner's claims for relief on the merits. This Court finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

## B.    ADEPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the

3

1  Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S.
2  12, 16 (2003).

3  A state court decision involves an "unreasonable application" of the Supreme Court's
4  precedents if the state court correctly identifies the governing legal principle, but applies it to the
5  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.
6  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from
7  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to
8  extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,
9  407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas
10 relief so long as fair-minded jurists could disagree on the correctness of the state court's
11 decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the
12 state court decision "was so lacking in justification that there was an error well understood and
13 comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

14 When reviewing a claim under § 2254(d), any "determination of a factual issue made by a
15 State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting
16 the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt
17 v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable
18 merely because the federal habeas court would have reached a different conclusion in the first
19 instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

20 Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any
21 constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.
22 Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of
23 AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-
24 prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas
25 petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable
26 precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.
27 112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

28

1 | to satisfy either [*Brecht*] or AEDPA.  But to grant relief, a court must find that the petition has

2 | cleared both tests."  *Id*. at 134.

3 |      As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

4 | an "adjudication on the merits" in state court.  An adjudication on the merits does not require that

5 | there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S.

6 | at 98.  "When a federal claim has been presented to a state court and the state court has denied

7 | relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

8 | of any indication or state-law procedural principles to the contrary."  *Id*. at 99.  "The presumption

9 | may be overcome when there is reason to think some other explanation for the state court's

10 | decision is more likely."  *Id*. at 99-100.  This presumption applies whether the state court fails to

11 | discuss all the claims or discusses some claims but not others.  *Johnson v. Williams*, 568 U.S.

12 | 289, 293, 298-301 (2013).

13 |      While such a decision is an "adjudication on the merits," the federal habeas court must

14 | still determine the state court's reasons for its decision in order to apply the deferential standard.

15 | When the relevant state-court decision on the merits is not accompanied by its reasons,

16 |
17 |
18 |     the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.
19 |
20 |

21 | *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

22 | court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

23 | decision, as AEDPA directs us to do."  *Id*. at 1196.

24 | **III.    RELEVANT FACTUAL BACKGROUND**

25 |      The Court adopts the pertinent facts of the underlying offenses, as summarized by the

26 | California Fifth District Court of Appeal.  A presumption of correctness applies to these facts.

27 | *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

28 |

1

# FACTUAL SUMMARY

2

## I.    Prosecution Case

3

The crimes in this case occurred in the Kern County city of Tehachapi. The victims, Guy K. and Jose F., were a gay couple in their 50's. Guy and Jose met defendant approximately six months before their murders when they came into the home improvement store where defendant worked. He assisted them at length that day and they returned the next day. One of Guy's and Jose's purchases was a barbecue grill and they mentioned to defendant barbecuing together sometime. During their second trip to the store, they exchanged phone numbers with defendant. Afterward, defendant periodically received a text inviting him to hang out and he viewed Guy and Jose as friends, but the three were never able to line up plans.

On August 31, 2014, defendant spent the afternoon and early evening with his new girlfriend and Luis, one of his two roommates. Shortly before 8:00 p.m., after defendant's girlfriend left to go home, Jose invited defendant by text message to join him and Guy for dinner and drinks at a restaurant in town. Defendant accepted and invited Luis to come along. Defendant and Luis met Guy and Jose at the restaurant sometime after 8:30 p.m.

Dinner was uneventful and the four men had a good time together. They ate dinner and shared two pitchers of margaritas and two rounds of tequila shots. Defendant and Jose each had an additional tequila shot and the group departed around 10:20 p.m. Defendant and Jose played around in the parking lot having footraces, which Guy took photographs of them on his cell phone. Additional alcohol was purchased at the liquor store near the restaurant and the group went to defendant's apartment. Mario, a friend of defendant's, arrived at the apartment around the same time and joined the group.

Inside, the five men drank whiskey shots and played beer pong. They had a good time and there was no sign of any trouble. At some point, Mario saw defendant go into his bedroom with Guy and Jose. The door to the bedroom was closed and the music was turned up. The three emerged approximately 20 minutes later, and Mario told defendant he was not comfortable and wanted to leave. Mario explained at trial that he preferred partying with both men and women and he was not interested in partying with just men. Mario also testified that defendant had jumped on him at one point without a shirt on and straddled his waist, which made him uncomfortable. Mario departed around 1:00 a.m. and met up with a former girlfriend. He recalled that when he left, Luis was asleep on the sofa and Jose and defendant were talking.

Luis testified that he went to sleep on the sofa because he had to work the next day. Prior to falling asleep, he saw Guy go to defendant's bedroom to sleep. Defendant and Jose were playing beer pong in the kitchen, and Mario was sitting on the sofa next to him. Everyone was having a good time.

Luis later awoke to the sound of a loud argument between defendant and Jose, and he testified that he saw Jose kiss, or attempt to kiss, defendant on the mouth. Luis saw defendant, who was 28 years old and trained in mixed martial arts (MMA) fighting, punch Jose once in the face, knocking Jose unconscious. Defendant then got on Jose's stomach and started punching and elbowing Jose in the face. Luis tried to pull defendant off Jose, but defendant told Luis not to touch him. Defendant continued to hit and kick Jose in the face, and Luis saw Jose's head hit the living room wall, leaving a hole in the drywall. Luis's cell phone was dead, so he left the apartment to get help, telling officers who interviewed him later that he feared for his own safety. During that time, Luis did not see Guy or Mario.

At approximately 3:20 a.m., Luis approached a police car at a gas station a mile or two away from defendant's apartment. He told the officer he wanted to remain anonymous and he reported a fight at defendant's apartment involving defendant. He also told the officer that three people were at the apartment. The officer wrote down the license plate to Luis's vehicle and radioed a second police officer for backup.

The two officers responded to defendant's apartment to investigate what they thought was a disturbance of the peace. Defendant answered the front door in his boxer shorts. The officers told defendant that neighbors heard arguing and they were checking to see if everything was okay. Defendant told the officers to hold on, and he then shut the door and locked the deadbolt. One of the officers noticed a spot of blood outside the door.

After waiting several minutes, the officers knocked again. Defendant answered the door a second time. He again told them to hang on because he needed to get dressed, and he shut and locked the door. After defendant shut the door, one of officers told the other that when defendant opened the door, she saw broken glass and what appeared to be a large amount of blood in the entryway, leading her to believe someone inside was either seriously injured or dead.

After obtaining a key from the apartment manager, the two officers and a sheriff's deputy who had arrived entered the apartment. They described the scene as very bloody, and they saw Jose, who appeared deceased, on the floor in the living room. They proceeded through the apartment and located Guy, who was also deceased, in the bathtub. Both victims had visibly swollen faces. Officers located defendant lying on his bed in the master bedroom clothed but wet and pretending to be asleep.

Defendant was handcuffed and escorted from the apartment. He repeatedly stated he had been sleeping and asked what was going on. He was escorted to a patrol car without incident, but he resisted the directive to step into the car. After being placed in the patrol car, defendant slipped his handcuffed arms from behind his back to his front, kicked at the windows, told the officers he was going to

kill them and referred to one of the officers as Chuck Liddell, an MMA fighter. After he was pepper sprayed, defendant calmed down.

At the police station, defendant gave a statement denying involvement in the crimes. A detective asked him, "There's been some—some things being said that maybe there was some—some gay stuff that tried to go on. Maybe someone tried to wake you up in the middle of the night with some gay stuff. We don't know. That's why we wanna talk to you." Defendant denied anything happened and stated that he went out to dinner with his girlfriend, went to bed when he got home and woke up to police "banging on [his] door." He also said that his friends Mario and Luis were over when he went to bed; there were some other people there he did not know but had seen once before; Mario was acting weird that night; and he had always felt Mario was working undercover. Defendant denied knowing the man found on the living room floor, indicated he had not seen any blood on the floor and stated that although he saw the man on his way to answer the door, he did not pay attention because he had "people on [his] floor all the time."

Later that same day defendant also spoke to the media. He denied any involvement in the crimes and again stated he was hanging out with friends, went to sleep and woke up to the police "banging on [his] door." He sent his thoughts and prayers to the victims' families.

## II.    Defense Case

Defendant testified that he had past training as an MMA fighter and was "decent" at it. He testified that although he kept in shape and retained the techniques he learned, he stopped MMA fighting in 2008, other than one cage fight in 2010. Defendant admitted that he killed Guy and Jose with his bare hands and that he lied about his involvement during his interviews with police and the media on the day of the crimes. He stated he did not tell the truth at the time because he was scared and embarrassed.

Defendant testified that after he and Luis met the victims for dinner on August 31, 2014, the group went back to his apartment and, joined by Mario, had a good time drinking and socializing. Defendant denied he ever retreated to his bedroom with Guy and Jose, but he said he gave them a brief tour of the apartment and showed them where the blankets and pillows were kept because he was more comfortable if they spent the night. Defendant acknowledged he jumped on Mario, but said he jumped on Mario's back and he denied he had his shirt off.

Defendant said he went to bed around 12:30 a.m. and closed his bedroom door. At that time, Luis was still awake, Mario was still there drinking, and Guy and Jose were in the living room. As was his routine, he disrobed entirely and went to sleep. He testified that he awoke in pain as Guy's penis penetrated his anus. As Guy raped him, Jose held him down by the shoulder and licked his face. Defendant testified that he felt shock, panic and fear, and that he

was concerned Guy had AIDS because Guy looked sick and he was aware Guy had a lot of medical appointments. Defendant struggled free, got up from the bed and went into the bathroom, which was in the hallway. Defendant testified he told Guy and Jose to leave.

In the bathroom, defendant turned on the taps in the sink and the bathtub, and he washed his face to remove Jose's saliva. As he prepared to get in the shower, Guy entered the bathroom. Guy approached defendant and tried to grab him by the shoulders. Defendant told Guy to get away and pushed him, causing him to fall into the bathtub. Defendant then grabbed Guy by the throat and hit him approximately 10 times while holding him down. Defendant testified that he possibly squeezed Guy's throat and that he hit Guy as hard as he could. Guy struggled some while defendant was hitting him, but he stayed in the bathtub where he first fell. Defendant washed his hands of Guy's blood and exited the bathroom. As defendant went to enter his bedroom, Jose exited.

Defendant told Jose to leave and they struggled as defendant pushed Jose toward the living room. Jose punched defendant once in the face and defendant hit him back, knocking him to the ground. Defendant could not tell if Jose was conscious or not, but he did not move after the first punch. Defendant hit Jose approximately 10 times as hard as he could, and he testified he may have stated, "[D]on't you ever fucking put your tongue down my throat," but he was referring to when Jose licked his face and attempted to kiss him in the bedroom. Defendant also kicked Jose in the location where there was a hole in the drywall. Defendant felt Luis grab him and he told Luis several times not to touch him. After Luis attempted to intervene and then left, defendant tried to drag Jose out of the apartment.

Afterward, defendant walked outside his apartment and then walked back inside. He dumped water on himself and may have wiped the apartment down. He testified that he also ripped the victims' shirts in anger. Defendant estimated that police arrived 20 minutes later, and he recalled answering the door and pretending nothing had happened.

Defendant denied that he pretended to be asleep when officers entered the apartment and found him on his bed, and he stated that he was no longer angry but he was in shock. He testified he did not want to enter the patrol car and he was upset and agitated, but he denied he screamed, yelled, threatened anyone, stated he wanted to kill the officers, or called anyone Chuck Liddell. He slipped his arms from behind his back to his front because he was in extreme pain from the handcuffs. While he was being transported, he also slipped his arms from behind his back to his front a second time.

Defendant conceded that while being questioned, the detective gave him an opening to explain what happened by asking whether "some gay stuff" that was unwelcome went on, but he lied because he was in denial, ashamed, embarrassed and fearful. Defendant denied that he was attempting to cast suspicion on Mario during his statement to police, but he testified that he felt like Mario had some

1   involvement in the situation, perhaps in egging Jose and Guy on,
2   although he did not see Mario in the apartment after he went to bed
    that evening.

3   (Doc. No. 24-18 at 2-7 (footnotes omitted)).

4   **IV.   ANALYSIS**

5   Each of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District

6   Court and denied on the merits, then subsequently raised and summarily denied by the California

7   Supreme Court.  Thus, each ground is exhausted, and the Court looks through to the Fifth

8   Appellate District's reasoned decision in evaluating each of Petitioner's claims under the

9   deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

10   **A.   Ground One-Improper Reliance on Invocation of Rights**

11   In his first ground, Petitioner asserts the prosecution's "introduction of and extensive

12   reliance on [Petitioner] invoking his 4th, 5th & 6th amendment rights violated due process and

13   requires reversal."  (Doc. No. 20 at 5).

14   **1.  State Court Decision**

15   The Fifth Appellate District denied Plaintiff's claim, ruling as follows:

16   **Due Process Claim: Use of Defendant's Exercise of**
     **Constitutional Rights Against Him**

17
18   **A.   Summary of Arguments**

19   Defendant relies on a combination of asserted prosecutorial errors
     for the proposition that he was denied a fair trial, in violation of his
     right to due process. On the day of the murders and after being read
20   his rights under *Miranda v. Arizona* (1966) 384 U.S. 436
     (*Miranda*), defendant made a statement to detectives denying
21   knowledge of or involvement in Guy's and Jose's murders. After
     speaking with detectives for a while, defendant invoked his rights
22   under *Miranda* and made no further statements to law enforcement.
     At trial, defendant testified that he killed Guy and Jose, whom he
23   had considered friends, in self-defense after he awoke to find
     himself being raped and feared he was about to be raped again, a
24   version of events that directly contradicted his prior statement to
     detectives that he had no knowledge of or involvement in the
25   crimes. On appeal, defendant argues that during trial the prosecutor
     erred by using his post-invocation silence against him, in violation
26   of his Fifth Amendment right to remain silent and Sixth
     Amendment right to counsel, and in contravention of *Doyle v. Ohio*
27   (1976) 426 U.S. 610, 619 (*Doyle*).

28   In addition, the prosecutor adduced evidence that defendant was "a

little bit reluctant" to cooperate with the request to swab his mouth for DNA until the detective provided him with a copy of the search warrant, after which he complied. Relying on *People v. Keener* (1983) 148 Cal.App.3d 73, 79 (*Keener*), defendant argues that the prosecutor improperly used his invocation of his Fourth Amendment right to decline DNA testing in the absence of a warrant against him to show consciousness of guilt.

The People contend that with respect to defendant's Fifth and Sixth Amendment rights, the prosecutor did not stray beyond the bounds of what was permissible given the discrepancies between defendant's statement to detectives and his trial testimony. With respect to defendant's Fourth Amendment rights, the People contend that the prosecutor may rely on a defendant's refusal to cooperate in the face of a court order to demonstrate consciousness of guilt (*People v. Ramirez* (2006) 39 Cal.4th 398, 456), and that defendant's lack of cooperation in the face of a valid warrant was not an invocation of his Fourth Amendment rights. The People further contend that even if error is assumed, defendant suffered no prejudice under the more stringent standard of review applicable to federal constitutional claims. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

For the reasons set forth below, we agree with the People and reject defendant's claim of reversible error.

**B.    Post-invocation Silence**

**1.    Forfeiture**

As a threshold matter, the People contend that defendant forfeited his claim under *Doyle* because trial counsel failed to object. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1333–1334; *People v. Collins* (2010) 49 Cal.4th 175, 202–203.) In response, defendant points out that objection would have been futile given that the trial court later condoned the introduction of the evidence. This argument specifically relates to trial counsel's objection and motion for a mistrial made during closing argument, and we note trial counsel's argument indicates there were earlier discussions off the record regarding the matter. Regardless, in this case, we need not determine whether defendant forfeited his claims of error because any error is harmless on this record. (*People v. Seumanu, supra*, at p. 1334.)

**2.    Procedural Background**

Defendant's claim of error under *Doyle* arises from the following exchanges, which occurred during the prosecutor's cross-examination of defendant:

"[PROSECUTOR:] ... But your story today—and this is the first time you ever told anybody else, and I'm excluding your attorney. I don't want to know about any conversations you had with your attorney. [¶] This is the first time that you ever said that Jose attacked you, correct?

11

"[DEFENDANT:] Yes.

"[PROSECUTOR:] And this is the very, very first time after you've heard all of the evidence in this case presented by the People that Guy [K.] attacked you?

"[DEFENDANT:] Yes."

Subsequently, the prosecutor asked defendant, "And, at that moment in time, your statement again for the very first time, and nobody has heard this before is that [G]uy attacked you in the bathroom?" Defendant's counsel objected to the question as argumentative and the trial court sustained it as to characterization.

During redirect, defense counsel addressed the issue as follows:

"[DEFENSE COUNSEL:] Mr. Balassa, between September 1st, 2014, to today in that year and a half period, when was the first time that year and a half that you had the first, very first opportunity to testify in front of the jury?

"[DEFENDANT:] That would be yesterday.

"[DEFENSE COUNSEL:] That was the very first time, right?

"[DEFENDANT:] "Yes. Yes, ma'am."

Defendant also claims that during closing argument, the prosecutor relied extensively on his post-invocation silence, repeatedly emphasizing his "new" story and relying on a "H[ai]l Mary" analogy.

### 3.    Analysis

### a.    Alleged *Doyle* Error

In *Doyle*, the United States Supreme Court held that the use of a defendant's silence following receipt of *Miranda* warnings to impeach him violates the due process clause of the Fourteenth Amendment. (*Doyle, supra*, 426 U.S. at p. 619; accord, *Anderson v. Charles* (1980) 447 U.S. 404, 408.) " '*Doyle* rests on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." ' " (*Greer v. Miller* (1987) 483 U.S. 756, 763, quoting *Wainwright v. Greenfield* (1986) 474 U.S. 284, 291.) Thus, "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson v. Charles, supra*, at p. 408.)

1

2       As defendant concedes, *Doyle* prohibits the use of his post-
        invocation silence against him, but it does not shield him from the
3       consequences of advancing inconsistent versions of events.
        (*Anderson v. Charles, supra*, 447 U.S. at pp. 407–408; *People v.*
4       *Champion* (2005) 134 Cal.App.4th 1440, 1448.) Further, " '[r]ecent
        fabrication may be inferred when it is shown that a witness did not
5       speak about an important matter at a time when it would have been
        natural for him to do so ....' " (*People v. Riccardi* (2012) 54 Cal.4th
6       758, 803, abrogated on another ground by *People v. Rangel* (2016)
        62 Cal.4th 1192, 1216; accord, *People v. Lopez* (2013) 56 Cal.4th
7       1028, 1066, abrogated on another ground by *People v. Rangel,*
        *supra*, at p. 1216.) " 'An assessment of whether the prosecutor
8       made inappropriate use of [the] defendant's postarrest silence
        requires consideration of the context of the prosecutor's inquiry or
9       argument' " (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534,
        1557, quoting *People v. Champion, supra*, at p. 1448), and the
10      United States Supreme Court has cautioned against too finely
        parsing cross-examination questions where the questions may be
11      designed "to elicit an explanation for a prior inconsistent statement"
        rather than "draw meaning from silence" (*Anderson v. Charles,*
        *supra*, at p. 409).
12

13      Defendant claims error because, one, the prosecutor improperly
        questioned him regarding the fact that he did not claim self-defense
14      at any time *between* his invocation of his rights under *Miranda* and
        his testimony at trial and, two, the prosecutor, in referring to his
15      "new" or "H[ai]l Mary" story numerous times, relied extensively on
        his post-invocation silence during closing argument. The California
16      Supreme Court has recognized that questions or arguments that
        focus on a defendant's silence between his pre-invocation statement
17      and trial may run afoul of *Doyle* (*People v. Belmontes* (1988) 45
        Cal.3d 744, 786, overruled on another ground in *People v. Cortez*
18      (2016) 63 Cal.4th 101, 118), while the United States Supreme
        Court has cautioned against attempting to "bifurcate[ ] so neatly" a
19      prosecutor's questions where the defendant has made inconsistent
        statements (*Anderson v. Charles, supra*, 447 U.S. at p. 408; accord,
20      *People v. Collins, supra*, 49 Cal.4th at p. 204).

21      Here, rather than specifically confining the emphasis to defendant's
        failure to mention self-defense in his statement to the detectives, the
22      prosecutor emphasized during questioning that defendant was
        claiming self-defense for the first time at trial. With respect to
23      closing argument, although we reject defendant's claim that the
        prosecutor's reference to his new story and a "H[ai]l Mary" defense
24      were comments on his post-invocation silence, the prosecutor did,
        in part, draw the jury's attention to the passage of one and one-half
25      years between defendant's first story and his second story. We need
        not decide, however, whether the prosecutor skirted, or even
26      crossed over the line into, *Doyle* error (*Anderson v. Charles, supra*,
        447 U.S. at p. 408; *People v. Collins, supra*, 49 Cal.4th at p. 204),
27      because if we assume error, it was harmless in this case.

28

13

**b.      Any Error Harmless**

**1)      Standard of Review**

State law errors are reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*), which requires a determination "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error." (*People v. Aranda* (2012) 55 Cal.4th 342, 354.) Where, as here, a federal constitutional error is claimed, the standard articulated in *Chapman* applies and "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831, citing *Neder v. United States* (1999) 527 U.S. 1, 18; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) " ' ' "To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the ... verdict actually rendered in this trial was surely unattributable to the error." [Citation.]' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

**2)      No Prejudice Shown**

Before he invoked his rights under *Miranda*, defendant denied any knowledge of or involvement in the crime. Defendant's subsequent claim at trial that he acted in self-defense directly contradicted his prior statement, which required defendant and his trial counsel to, one, address why he lied to detectives despite being asked whether some unwelcome sexual activity had occurred and, two, attempt to convince the jury that despite lying previously, he was telling the truth at trial. That defendant told two starkly contrasting versions of events that could not be reconciled significantly damaged his credibility and undermined his claim that he had been victimized and, fearing further attack, acted in self-defense.

The prosecutor was entitled to and did use defendant's prior inconsistent statement, including his failure to mention any need for self-defense to detectives, to impeach his credibility as to his self-defense claim at trial. Therefore, to the extent the prosecutor arguably also drew the jury's attention, impermissibly, to defendant's failure to claim self-defense during the period of post-invocation silence, such evidence was cumulative in nature. Put simply, the damage to defendant's credibility was inflicted not by any reference to his post-invocation silence, but by the starkly contrasting versions of events and his failure to tell detectives he had been attacked and feared further attack. (*People v. Collins, supra*, 49 Cal.4th at p. 204.)

Furthermore, defendant conceded that although Guy struggled, Guy stayed in the tub where he first fell while defendant held him down by the throat and hit him as hard as defendant could, and that after defendant incapacitated Jose with the first punch, he continued to

1   hit Jose as hard as he could. The evidence reflects that both men
    were brutally beaten to death. The coroner testified that Guy
2   suffered approximately 20 to 30 blows to his left side and chest, a
    minimum of 7 to 10 blows to his face, including one fracture so
3   severe the bone caved in, and unusual bruising to his lips consistent
    with smothering. Jose suffered a minimum of 7 to 10 blows to his
4   face, resulting in fractured bones; defendant kicked Jose in the head
    so hard that his head made a hole in the drywall; and Jose had
5   severe bleeding near his brain stem and a neck compression injury,
    either one of which could have caused his death.

6
    The jury, after requesting further instruction on the meaning of
7   " 'the test [for deliberation and premeditation] is the extent of the
    reflection, not the length of time' " and a readback of the coroner's
8   testimony, found the murders of Jose and Guy premeditated,
    evidencing "a complete rejection of the evidence on which [the]
9   defendant relied to establish self-defense." (*People v. Crandell*
    (1988) 46 Cal.3d 833, 874, disapproved on another ground by
10  *People v. Crayton* (2002) 28 Cal.4th 346, 364–365.) Under the
    aforementioned circumstances, to the extent the prosecutor's
11  questions and argument treaded into the territory of defendant's
    post-invocation silence, the harm, if any, was negligible.

12
    Defendant's reliance on *People v. Schindler* (1980) 114 Cal.App.3d
13  178 (*Schindler*) for the contrary proposition is misplaced. The
    defendant in *Schindler*, who shot and killed her husband, was
14  charged with and convicted of *second* degree murder. (*Id.* at p.
    181.) The defense presented "extensive evidence" on the issues of
15  diminished capacity and self-defense, and "[n]umerous witnesses ...
    testified that [the] defendant was a passive, gentle, dependent,
16  severely depressed woman who was afraid of her domineering,
    explosive, irrationally hostile husband." (*Ibid.*) Moreover, the
17  victim had killed his previous wife while they were divorcing,
    which he boasted about, and he enjoyed frightening the defendant.
18  (*Ibid.*)

19  The defendant invoked her rights under *Miranda* and, during trial,
    the prosecutor used her silence and her desire to hire the specific
20  attorney who prosecuted the victim for the death of his first wife
    against her. (*Schindler, supra,* 114 Cal.App.3d at pp. 183–184.) The
21  Court of Appeal found that "[t]he prosecution not only
    impermissibly introduced evidence concerning [the] defendant's
22  exercise of her right [to remain silent] but also affirmatively used
    this evidence in argument to convey the impression that her defense
23  of a 'panic state' was fabricated" (*id.* at p. 186), and the prosecution
    also impermissibly used "her choice of defense attorney to impeach
24  her and rebut her defense of diminished capacity" (*id.* at p. 187).
    The court then concluded the errors were prejudicial, explaining,
25  "The only issue at trial was [the] defendant's intent and mental
    capacity at the time of the commission of the offense. The defense
26  evidence was substantial. The rebuttal evidence directly attacked
    her defense, and the prosecutor's argument that the evidence
27  showed she was fabricating her 'panic' state was most prejudicial.
    Furthermore, the fact that the jury deliberated 22 hours before
28  reaching a verdict underscores the closeness of the case and the

crucial nature of the constitutional violations." (*Id.* at p. 190.)

*Schindler* is distinguishable. The defendant there did not make inconsistent statements that were used against her, the prosecutor used her silence and her retention of a specific defense attorney to affirmatively attack the credibility of her defense, and she was not charged with premeditated murder. Here, as discussed, while the prosecutor emphasized that defendant was claiming self-defense for the first time at trial, his self-defense claim was undercut by his contradictory statement to detectives, which permitted the prosecutor both to elicit evidence that defendant at no time on the morning of the crimes informed anyone—his sleeping roommate, a 911 operator, the officers who responded to his apartment or the detectives who interrogated him—that he acted in self-defense and to impeach him with his inconsistent accounts. The prosecutor also did not use defendant's exercise of his constitutional rights against him affirmatively, as did the prosecutor in *Schindler.*

Accordingly, we find defendant's reliance on *Schindler* unpersuasive, and we conclude that defendant was not prejudiced by any arguable error under *Doyle.*

## C.    Lack of Cooperation with DNA Collection

### 1.    Background

Relatedly, defendant argues that because he had a right under the Fourth Amendment to refuse "what he believed to be a warrantless [DNA] search," the prosecutor erred in using his exercise of that right against him. (*Keener, supra*, 148 Cal.App.3d at pp. 78–79; accord, *People v. Wood* (2002) 103 Cal.App.4th 803, 808–809.) For the reasons that follow, we agree with the People that no error occurred.

As circumstantial evidence of consciousness of guilt, the prosecutor sought to introduce evidence of defendant's initial lack of cooperation with Sergeant Hubbard's request to submit to a DNA test, for which Hubbard had a warrant. Prior to trial, defense counsel argued that the assertion of a right does not demonstrate consciousness of guilt. After holding a hearing under Evidence Code section 402, the trial court ruled that the evidence had some relevance to consciousness of guilt and any prejudice was minimal given that defendant cooperated with the test.

During direct examination, the prosecutor questioned Sergeant Hubbard as follows:

"[SERGEANT HUBBARD:] "I explained to him that we were going to take a buccal swab and some swabs from his body. He was a little bit reluctant to allow me to do that, so I presented him with a search warrant that I had authored.

"[PROSECUTOR:] In addition to allowing you to take a buccal swab, did that search warrant authorize you to take photographs of the defendant as well?

16

"[SERGEANT HUBBARD:] Yes.

"[PROSECUTOR:] And did you actually allow the defendant to read that search warrant?

"[SERGEANT HUBBARD:] I did.

"[PROSECUTOR:] Did you observe him looking at it?

"[SERGEANT HUBBARD:] Yes.

"[PROSECUTOR:] "For how long?

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE COURT: Well, I will overrule it. I don't know if you can answer that. [¶] How long do you think he was looking at it?

"[SERGEANT HUBBARD]: I don't know if I could give a time. He appeared to be reading it. It was—I don't have a copy of it in front of me. I believe it was maybe three pages, a decent amount of time, but not too long.

"[PROSECUTOR:] Now, after reading the search warrant, did the defendant's demeanor change at all?

"[SERGEANT HUBBARD:] I don't know if I would classify.

"[DEFENSE COUNSEL]: I would object, Your Honor. Relevance. In limine motions.

"THE COURT: No, I'm going to overrule it. I will overrule it. Do you understand the question?

"[SERGEANT HUBBARD]: I do, Your Honor.

THE COURT: All right. Go ahead. You can answer it.

"[SERGEANT HUBBARD]: I don't believe his demeanor changed. His level of cooperation might have changed or varied slightly.

"[PROSECUTOR:] In which way?

"[SERGEANT HUBBARD:] He complied with—with the search warrant."

Subsequently, the prosecutor questioned Sergeant Hubbard regarding his collection of DNA from Luis as follows:

"[PROSECUTOR:] ... Can you describe [Luis's] demeanor when meeting with him?

"[SERGEANT HUBBARD:] He was very cooperative.

17

1    "[PROSECUTOR]: How so?

2    [SERGEANT HUBBARD:] Everything I asked him to do, he did.
     He offered to provide statements. He offered to do anything that I
3    had asked him to do.

4    "[PROSECUTOR:] Did you have to show [Luis] a search warrant?

5    "[DEFENSE COUNSEL]: Objection, Your Honor. Relevance.

6    "THE COURT: Yeah, I will sustain the objection, so I will sustain
     the objection.
7
     "[PROSECUTOR]: Understood."
8
     During cross-examination of defendant, the prosecutor asked the
9    following questions:

10   "[PROSECUTOR:] They collected the DNA from you, correct?

11   "[DEFENDANT:] Yes.

12   "[PROSECUTOR:] But only after you looked at the search warrant,
     correct?
13
     "[DEFENDANT:] Yes.
14
     "[PROSECUTOR:] "Would it be fair to say that you knew there
15   would be a good possibility that it would be one or both of the
     victims' DNA on some part of your body or your clothing, right?
16
     "[DEFENDANT:] I don't know.
17
     "[PROSECUTOR:] Okay. And that's why you initially—until they
18   showed you the search warrant, you didn't really want to cooperate
     with giving the DNA sample; is that correct?
19
     "[DEFENSE COUNSEL]: I'm going to object as treading on in
20   limine motions.

21   THE COURT: No, I'm going to overrule it. So do you understand
     the question?
22
     "[DEFENDANT]: No.
23
     "[PROSECUTOR:] Okay. Did you believe at that moment in time
24   that there was a possibility— again. I'm talking about what you
     were thinking that either Guy [K.] or Jose [F.]'s] DNA would be
25   either on you or on your clothing?

26   "[DEFENDANT:] I don't know.

27   "[DEFENSE COUNSEL]: That was asked and answered, Your
     Honor, that question.
28

1    "THE COURT: I didn't think it was.

2    "[PROSECUTOR]: I didn't think it was either.

3    "THE COURT: If it was, I apologize. I don't remember it, [defense counsel], and I will let him answer. What was the answer,
4    [defendant]?

5    "[DEFENDANT]: I don't remember.

6    "THE COURT: I don't remember. [¶] Go ahead. Ask another question.

7

8    "[PROSECUTOR:] Why was it that you didn't want to give the DNA sample until you saw the search warrant?

9    "[DEFENSE COUNSEL]: Objection. Relevance. It's in limine motions.

10    "THE COURT: Go ahead. You can answer the question.

11

12    "[DEFENDANT]: I didn't like the way I was being treated.

13    "[PROSECUTOR:] So you thought you were being treated unfairly at that point in time?

14    "[DEFENSE COUNSEL]: Objection, Your Honor. That misstates the evidence.

15

16    "[PROSECUTOR]: Well, I'm asking a question. It's a new topic.

17    "THE COURT: It's a question relative to the last answer. I will overrule it. [¶] Go ahead. You can answer that.

18    "[DEFENDANT]: Nothing fairly. I just didn't feel like they were treating me.

19

20    "[PROSECUTOR:] Would it be fair to say at this point in time, you didn't give them a lot of information to go on?

21    "[DEFENDANT:] Yes.

22    "[DEFENSE COUNSEL]: Objection. Argumentative.

23    "THE COURT: It does appear to be argumentative, so I'm going to sustain the objection.

24

25    "[PROSECUTOR:] So at this point in time, you hadn't given a single officer any information to believe that you were the victim of a crime?

26

27    "[DEFENDANT:] No, sir."

28

19

## 2.    No Error

In *Keener*, cited by defendant in support of his claim of error, an underage teenager reported that the defendant sexually assaulted her, and police went to his apartment to discuss the alleged incident with him. (*Keener, supra*, 148 Cal.App.3d at p. 76.) The defendant refused to let police enter after an officer declined to tell him whether the incident involved a rape and he refused to discuss the incident with them. (*Ibid.*) After an officer spent an hour trying to convince the defendant to open the door, unsuccessfully, the SWAT team arrived and spent three and one-half hours negotiating with the defendant before he surrendered. (*Ibid.*) Officers then searched the apartment for a second person and, finding no one, exited. (*Ibid.*) Subsequently, and still without a warrant, another officer entered again to retrieve a gun that was spotted during the first search. (*Id.* at pp. 76–77.)

During trial, the prosecutor extensively detailed what the Court of Appeal "characterized as a siege of [the] defendant's apartment" for the purpose of demonstrating consciousness of guilt. (*Keener, supra*, 148 Cal.App.3d at p. 78.) The court reversed the judgment, explaining, "Admission of this questionably relevant evidence violated the privilege to be free from comment upon the assertion of a constitutional right. (See *Jenkins v. Anderson* (1980) 447 U.S. 231; *Doyle*[, *supra*,] 426 U.S. [at p.] 619; *Griffin v. California* (1964) 380 U.S. 609.) Although an individual's refusal to consent to a warrantless entry of his residence may be open to various interpretations and is not encouraged, the assertion of the right itself cannot be a crime nor can it be evidence of a crime. [Citations.] [¶] Presenting evidence of an individual's exercise of a right to refuse to consent to entry in order to demonstrate a consciousness of guilt merely serves to punish the exercise of the right to insist upon a warrant. It is of no consequence that police had a right to enter without a warrant here, nor does it matter that [the] defendant spoke to the police during the siege. 'The right to refuse [entry] protects both the innocent and the guilty, and to use its exercise against the defendant would be, as the court said in *Griffin*, a penalty imposed by courts for exercising a constitutional right.' " (*Id.* at pp. 78–79; accord, *People v. Wood, supra*, 103 Cal.App.4th at pp. 808–809 [it was harmless error under *Keener* to admit evidence that the defendant refused to permit an officer to enter his property without a warrant for the purpose of investigating an animal abuse complaint].)

The facts in this case are readily distinguishable from those in *Keener*. For one, notwithstanding defendant's contrary argument, it is not clear from the record that defendant's initial lack of cooperation was related to an invocation or attempted invocation of rights under the Fourth Amendment. Although Sergeant Hubbard showed defendant the search warrant, there is no evidence that defendant asked to see a warrant or otherwise mentioned a warrant; defendant was also uncooperative while being photographed, which occurred prior to the DNA testing; and related to the DNA collection, defendant testified at trial that he did not like how he was being treated. Moreover, unlike in *Keener*, the prosecutor in

this case spent very little time overall on the issue of defendant's response to the DNA test request and, therefore, the evidence that he was initially uncooperative and then cooperative after he saw the search warrant played an insignificant role at trial. (*Keener, supra*, 148 Cal.App.3d at p. 78.)

Finally, critically and in contrast with *Keener*, the issue here was not *whether* defendant killed the victims but *why* he did so. (*Keener, supra*, 148 Cal.App.3d at p. 77.) The prosecutor did not mention the search warrant at all during closing argument and instead connected the issue of defendant's uncooperativeness to his desire to preserve the story he told that day; that is, that the crimes occurred while he was asleep and he was not involved. To that end, the prosecutor argued, "He's somewhat uncooperative in giving DNA. [¶] Now, it's common sense knowledge. We all kind of know DNA. We use it to identify people. And he's going with it wasn't me, so, no, I don't want DNA testing, because that might break[ ]down my story. That might damage my claim [of], it wasn't me, so he doesn't want to give it and he reiterates that defense with Sergeant Hubbard."

For these reasons, we are not persuaded by defendant's claim that his uncooperativeness was used against him in a manner that punished him for invoking his constitutional rights. Furthermore, even if we assumed constitutional error for the sake of argument, given the overall insignificance of the evidence, his admission that he caused Guy's and Jose's deaths, and the jury's premeditation finding, the verdict in this case " ' "was surely unattributable to the error." ' " (*People v. Pearson, supra*, 56 Cal.4th at p. 463.)

(Doc. No. 24-18 at 8-20 (footnotes omitted)).

### 2. Analysis

Petitioner argues the "irony" of his case is that the invocation of his basic rights "actually formed a central portion" of the case against him because the prosecutor was allowed to introduce "evidence of invocations and then relied on it to try to show a consciousness of guilt" and relied on inadmissible evidence. (Doc. No. 20 at 5.) However, Petitioner wholly fails to engage with the state court's analysis and rejection of these claims or present any argument as to why the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent or based on an unreasonable determination of the facts. Regardless of this deficiency, the undersigned's review of the record does not reveal a basis for federal habeas relief based on the state court's conclusion that any constitutional error was harmless.

As to Petitioner's silence, the appellate court set forth the correct standard under *Doyle* for evaluating Petitioner's claim that the prosecution improperly relied on his invocation of his

*Miranda* rights to support a guilty verdict.  (Doc. No. 24-18 at 10-11).  The court correctly

explained that "*Doyle* prohibits the use of his post-invocation silence against him, but it does not

shield him from the consequences of advancing inconsistent versions of events."  (*Id.* at 11).

Ultimately, the court determined that to the extent the prosecution "skirted, or even crossed over

the line into, *Doyle* error," any error was harmless under *Chapman*.  (*Id.* at 12-15).  The appellate

court cited the inconsistencies between Petitioner's statements to police and his testimony at trial,

the evidence at trial regarding the extensive injuries to the victims, and the jury's finding of

premeditation, which amounted to a complete rejection of Petitioner's self-defense claim.  (*Id.*).

Turning to Petitioner's lack of cooperation with the DNA collection, the state appellate

court first noted that it was not clear that such "was related to an invocation or attempted

invocation of rights under the Fourth Amendment" because Petitioner testified that he did not like

how he was being treated.  (*Id.* at 20).  To the extent Petitioner's behavior was based on his

Fourth Amendment rights, the court concluded it was not "used against him in a manner that

punished him for invoking his constitutional rights" because the prosecutor spent little time on the

issue; the evidence that Petitioner was initially uncooperative "played an insignificant role at

trial;" and the prosecution connected the uncooperativeness not to a refusal to comply without a

warrant but rather to Petitioner's desire to maintain his initial explanation that he was not

involved in the crimes.  (*Id.*).  Importantly, the appellate court concluded that even if it assumed

constitutional error, "given the overall significance of the evidence, [Petitioner's] admission that

he caused Guy's and Jose's deaths, and the jury's premeditation finding," the verdict was "surely

unattributable to the error."  (*Id.* (quoting *People v. Pearson*, 56 Cal. 4th 393, 463 (2013)

(applying *Chapman*))).

Under *Chapman*, "the test for determining whether a constitutional error is harmless … is

whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to

the verdict obtained.'"  *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman*, 386

U.S. at 24).  Under this standard, this Court asks whether the Court of Appeal applied *Chapman*

in an "objectively unreasonable" manner, *see Lockye v. Andrade*, 538 U.S. 63, 75 (2003),

meaning this court asks whether the "*harmlessness determination itself* was unreasonable," *Fry v.*

1   *Pliler*, 551 U.S. 112, 119 (2007).  To meet this standard, Petitioner must show that the state

2   court's decision to reject his claim "was so lacking in justification that there was an error well

3   understood and comprehended in existing law beyond any possibility for fairminded

4   disagreement." *Richter*, 562 U.S. at 103.  To do so, Petitioner must show that the error had a

5   "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S.

6   at 62.

7          Under the deferential standard mandated by § 2254(d), the undersigned cannot find that

8   the state appellate court's harmless error determination regarding Petitioner's claims was

9   unreasonable.  Regardless of any error, there was ample evidence from which the jury could

10  conclude Petitioner acted not out of self-defense but with the required premeditation and

11  deliberation necessary to support his convictions.  Petitioner has failed to show that any reliance

12  on his silence or initial refusal to provide DNA had a "substantial and injurious effect or influence

13  in determining the jury's verdict." *Brecht*, 507 U.S. at 62.

14         Ultimately, Petitioner fails to demonstrate that the state court's rejection of his improper

15  reliance claim was contrary, or an unreasonable application of, clearly established federal law, or

16  based upon an unreasonable determination of the facts.  Thus, the undersigned recommends that

17  ground one be denied.

18         **B.      Grounds Two and Three-Instructional Error**

19         Petitioners second and third grounds raise similar, related issues.  In ground two,

20  Petitioner asserts the trial court's failure to instruct the jury that they could acquit of murder if

21  they found Petitioner honestly believed he was in imminent danger of being raped violated his

22  right to accurate instructions on all elements of the charges.  (Doc. No. 20 at 7).  In ground three,

23  Petitioner argues the erroneous self-defense instructions removed a critical element from the

24  jury's consideration, undercut the defense, and lightened the state's burden of proof for

25  conviction.  (*Id.* at 8).

26         **1.   State Court Decision**

27         In rejecting Petitioner's instructional error claims, the Fifth Appellate District court found

28  as follows:

23

1

2

**Claims of Instructional Error**

3

**A.    Error in Instruction as Given: CALCRIM No. 571**

4

**1.    Background**

5    With respect to complete, or perfect, self-defense, the trial court instructed the jury, in relevant part, pursuant to CALCRIM No. 505 as follows:

6

7    "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self defense. The defendant acted in lawful self defense if, number one, the defendant reasonably believed that *he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being raped.* Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. And, three, the defendant used no [more] force than was reasonably necessary to defend against that danger." (Italics added.)

8

9

10

11    With respect to imperfect self-defense, the trial court instructed the jury, in relevant part, pursuant to CALCRIM No. 571 as follows:

12

13    "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person, because he acted in imperfect self defense. [¶] If you conclude the defendant acted in complete self defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self defense and imperfect self defense depends on whether the defendant's belief [in] the need to use deadly force was reasonable. The defendant acted in imperfect self defense if, one, the defendant actually believed that *he was in imminent danger of being killed or suffering great bodily injury.* And, two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger. But, number three, at least one of those beliefs was unreasonable...."

14

15

16

17

18

19

20    Defendant claims that when the trial court instructed the jury on imperfect self-defense, it erred in failing to include in the instruction that he acted in imperfect self-defense if he actually believed he was in imminent danger of being raped, in uniformity with its instruction to the jury on complete self-defense. Defendant argues that the omission of the reference to rape in the imperfect self-defense instruction was erroneous because one, it conveyed to the jury that great bodily injury differed from rape and, two, conveying that distinction "rendered the defense all but unavailable in this case."

21

22

23

24

25

26    The People respond that defendant forfeited his claim of error because he failed to object and request the instruction be modified. The People contend further that regardless, the instruction "adequately conveyed the law" and the inclusion of rape in the instruction would have been redundant, as it was in the complete self-defense instruction; and even if error is assumed, it was

27

28

24

harmless.

## 2.    Standard of Review

We review a claim of instructional error review de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356.) " ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson*.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 919.) "[W]e inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873; accord, *People v. Friend* (2009) 47 Cal.4th 1, 79.) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

## 3.    Forfeiture

Anticipating, correctly, that the People would advance a forfeiture argument, defendant argues that an objection is not required where the deficiency at issue affected his substantial rights. (§ 1259; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15; *People v. Townsel* (2016) 63 Cal.4th 25, 59–60.) In addition, he argues that counsel's failure to object constituted ineffective assistance of counsel and we may address that claim on review. While "a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel" (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14, citing *People v. Riel* (2000) 22 Cal.4th 1153, 1202–1203), we need not decide whether the forfeiture doctrine applies here because we conclude that any error was harmless (*People v. Johnson* (2016) 62 Cal.4th 600, 639; accord, *People v. Covarrubias, supra*, 1 Cal.5th at p. 919).

## 4.    Any Error Harmless

This case does not involve a failure by the trial court to instruct the jury on an affirmative defense, thereby preventing the jury from considering the defense. Rather, the claim is limited to whether the trial court erred in failing to include the crime of rape expressly when it instructed the jury that defendant acted in imperfect self-defense if he "actually believed that he was in imminent danger of being killed or suffering great bodily injury." (CALCRIM No. 571.) There is no dispute that rape is within the category of "forcible and

atrocious crime[s]" to which complete self-defense and imperfect self-defense apply (*People v. Ceballos* (1974) 12 Cal.3d 470, 478), but CALCRIM No. 505 (complete self-defense) contains bracketed language for the inclusion of specific forcible and atrocious crimes such as being raped, maimed or robbed, while CALCRIM No. 571 (imperfect self-defense) does not.

In reviewing a claim of error, we view the jury instructions as a whole (*People v. Covarrubias, supra*, 1 Cal.5th at p. 912), and jurors are presumed rational (*People v. Lara* (2019) 6 Cal.5th 1128, 1138). The jury here was instructed that "[g]reat bodily injury means it is significant or substantial physical injury" and "is an injury that is greater than minor or moderate harm." Furthermore, the evidence in this case and the arguments advanced by the parties left no dispute that defendant's asserted need to employ self-defense, whether actual and reasonable or actual but unreasonable, was tethered to his claim that he awoke to being raped by Guy and he then feared Guy and Jose were going to rape him again. Under these circumstances, defendant's characterization of the error as one that "rendered the defense all but unavailable in this case" is a vast overstatement, and he fails to persuade us that the omission of the word rape from the instruction misled the jury.

Regardless, assuming error, it was harmless even under the more stringent federal standard of review. That is, we find beyond "reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt, supra*, 2 Cal.5th at p. 831, citing *Neder v. United States, supra*, 527 U.S. at p. 18.) The jury convicted defendant of the deliberate and premeditated murders of Guy and Jose, which, as previously stated, reflects "a complete rejection of the evidence on which [the] defendant relied to establish self-defense." (*People v. Crandell, supra*, 46 Cal.3d at p. 874, disapproved on another ground by *People v. Crayton, supra*, 28 Cal.4th at pp. 364–365.) Moreover, based on the evidence, the parties' arguments to the jury, and the instruction on complete self-defense, the nature of defendant's self-defense claim was clear to the jury. The pivotal issue was, instead, whether the jury found defendant's trial testimony credible. Defendant fails to convince us that the jury's first degree murder verdict was attributable to the omission of the word rape from CALCRIM No. 571. (*People v. Pearson, supra*, 56 Cal.4th at p. 463.)

We also disagree with defendant's description of the case as close. Defendant testified that he awoke in pain to find himself being raped in his bed by Guy, but defendant did not strike Guy or Jose in the bedroom, yell for help, wake Luis up, or call 911. He instead went into the bathroom with his alleged attackers still in the apartment and prepared to shower to wash Jose's saliva off his face. When Guy allegedly entered the bathroom and reached for him, defendant knocked Guy backward into the bathtub with one blow and then proceeded to hold him down by the throat and rain blows down on him, causing his death. Leaving Guy dead or near death, defendant exited the bathroom. Again, he did not yell for help, wake Luis up, call 911 or seek out a place of safety. Instead, he returned to the bedroom and encountered Jose coming out.

Defendant described an ensuing struggle during which he knocked Jose out with one blow and then proceeded to pummel him to death, undeterred by Luis's attempts to interrupt the attack.

Defendant also described acting out of anger and there was evidence that after the murders, he attempted to clean himself and the crime scene up. When police arrived, defendant did not tell them he had been raped or that he killed Jose and Guy in self-defense. To the contrary, defendant acted as if nothing happened and he behaved combatively enough at the scene that an officer had to pepper spray him. Once he was taken into custody, defendant insisted he did not know what happened and was not involved, despite a detective giving him an opening as to whether something unwelcome of a sexual nature had occurred.

The physical evidence, defendant's trial testimony regarding what occurred, and the evidence of his behavior at the scene and during interrogation are difficult to reconcile with his claim of self-defense to prevent a rape. The jury ultimately rejected that claim and we find defendant's characterization of this as a close case in which the jury was misled by the omission of the word rape from the imperfect self-defense instruction meritless.

**B.      Failure to Instruct: CALJIC No. 5.10**

**1.      Background**

CALJIC No. 5.10 provides that "[h]omicide is justifiable and not unlawful when committed by any person who is resisting an attempt to commit a forcible and atrocious crime." Defendant claims that in failing to instruct the jury pursuant CALJIC No. 5.10, the trial court impermissibly limited his complete self-defense theory.

Relevant to defendant's claim of error, section 197, which pertains to justifiable homicide, provides:

"Homicide is also justifiable when committed by any person in any of the following cases:

"(1) *When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.*

"(2) When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.

"(3) When committed in the lawful defense of such person, or of a spouse, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in

27

whose behalf the defense was made, if he or she was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.

"(4) When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace." (Italics added.)

Section 198 provides, "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. *But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.*" (Italics added.)

As set forth in part in the preceding section, the trial court instructed the jury on complete self-defense pursuant to CALCRIM No. 505 as follows:

"The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self defense. The defendant acted in lawful self defense if, number one, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being raped. Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. And, three, the defendant used no [more] force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient no matter how great or how likely the harm is going to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. *The defendant's belief must have been reasonable and he must have acted only because of that belief....*" (Italics added.)

Defendant claims that the trial court should have instructed the jury with CALJIC No. 5.10, which accurately summarizes justifiable homicide under section 197, subdivision (1), by straightforwardly informing the jury that "[h]omicide is justifiable and not unlawful when committed by any person who is resisting an attempt to commit a forcible and atrocious crime." Defendant contends that CALCRIM No. 505 misstates the law with respect to the portion that provides that "[d]efendant's belief must have been reasonable and he must have acted only because of that belief," because the instruction imports to section 197, subdivision (1), requirements from section 198 that apply only to section 197, subdivisions (2) and (3). Defendant asserts that CALCRIM No. 505 "tells the jury it could find self-defense if it found [defendant] 'reasonably believed' he was about to be raped, 'reasonably believed' deadly force was necessary to repel the danger, and he 'acted only because of that belief.' [Citation.] These limitations on the right to self-defense come directly from section 198 and should have had no place in this self-defense case under section 197, subdivision (1)."

1

2

### 2.    No Error

The essence of defendant's argument is that because he claimed he killed Guy and then Jose while defending himself from another rape, "the proper inquiry for the jury is [limited to] (1) whether the decedent was in fact attempting to commit a rape, and (2) whether the defendant killed while resisting that attempt," irrespective of the reasonableness of defendant's belief or whether defendant acted for a reason other than that belief. (§ 197, subd. (1).) We reject defendant's view and find no error.

### a.    Instructions Not Viewed in Isolation

We begin by observing that in interpreting the term "a felony" in section 197, subdivision (1), the Court of Appeal in *People v. Jones* (1961) 191 Cal.App.2d 478 explained, "[T]he section does no more than codify the common law and should be read in the light of it. Taken at face value, and without qualification, it represents an oversimplification of the law today." (*Id.* at p. 481.) The court recognized that the common law rule codified in section 197, subdivision (1), was "limited to the commission of felonies that involve a danger of great personal harm, or 'some atrocious crime attempted to be committed by force.' " (*People v. Jones, supra*, at p. 481.)

Subsequently, in *People v. Ceballos*, the California Supreme Court cited *People v. Jones* with approval and stated, "By its terms subdivision 1 of ... section 197 appears to permit killing to prevent any 'felony,' but in view of the large number of felonies today and the inclusion of many that do not involve a danger of serious bodily harm, a literal reading of the section is undesirable." (*People v. Ceballos, supra*, 12 Cal.3d at pp. 477–478.) The court recognized "the rule developed at common law that killing or use of deadly force to prevent a felony was justified only if the offense was a forcible and atrocious crime," such as murder, mayhem, rape and robbery. (*Id.* at p. 478.)

Although the focus of defendant's challenge to CALCRIM No. 505 is not the "a felony" language in section 197, subdivision (1), the aforementioned cases bear mention because defendant's argument, too, relies on the bare statutory language to oversimplify what the law requires to establish self-defense. A single jury instruction may not be viewed in " ' "artificial isolation" ' " (*People v. Mills* (2012) 55 Cal.4th 663, 677; accord, *People v. Holt, supra*, 15 Cal.4th at p. 677; *People v. Thomas, supra*, 52 Cal.4th at p. 356) and, here, CALJIC No. 5.10 does not represent the sum total instruction to the jury on justifiable homicide under CALJIC instructions.

Specifically, CALJIC No. 5.12, which is used in connection with CALJIC No. 5.10, provides:

"The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes:

"1. That there is imminent danger that the other person will either kill [him] [her] or cause [him] [her] great bodily injury; and

"2. That it is necessary under the circumstances for [him] [her] to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to [himself] [herself].

"A bare fear of death or great bodily injury is not sufficient to justify a homicide. *To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone.* The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm." (CALJIC No. 5.12, italics added.)

Thus, the CALJIC instructions communicate to the jury the very same information that defendant claims is erroneous under CALCRIM No. 505.

### b.      Reasonableness of Belief

Turning to defendant's specific arguments, defendant's position that the jury should have been instructed with CALJIC No. 5.10 because it does not include the requirement of reasonableness is untenable. (*People v. Barillas* (1996) 49 Cal.App.4th 1012, 1023 [CALJIC No. 5.10 "surplusage, added nothing to the other instructions, and should not have been given"].) As the People contend, it is long and well established that "[f]or perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury." (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled in part on another ground by *People v. Chun* (2009) 45 Cal.4th 1172, 1200–1201; accord, *People v. Elmore* (2014) 59 Cal.4th 121, 133–134; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Flannel* (1979) 25 Cal.3d 668, 674–675; *People v. Trevino* (1988) 200 Cal.App.3d 874, 878–879.) The actual but unreasonable belief in the necessity of defending oneself is imperfect self-defense. (*People v. Randle, supra*, at p. 994; accord, *People v. Elmore, supra*, at p. 134; *People v. Humphrey, supra*, at p. 1082.) The proposition advanced by defendant is contrary to established law, which we are bound by, and we reject it. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197–198, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### c.      Reasonable Fear Must Motivate Act of Deadly Force

Defendant's remaining challenge similarly lacks merit. Defendant highlights the prosecutor's argument that he killed Guy and Jose in anger, and he asserts that the court erred in "advis[ing] the jury that [he] could rely on self-defense only if no other factors contributed

1    to the homicide[s]." This portion of CALCRIM No. 505, however,
     is an accurate statement of law. (*People v. Trevino, supra*, 200
2    Cal.App.3d at pp. 878–879.)

3        In *People v. Trevino*, this court explained, it is "settled that '[t]o be
     exculpated on a theory of self-defense one must have an honest *and*
4    reasonable belief in the need to defend. [Citations.] A bare fear is
     not enough; "the circumstances must be sufficient to excite the
5    fears of a reasonable person, and the party killing must have acted
     under the influence of such fears alone." (Pen. Code, § 198.)'
6    [Citations.] Hence, an instruction which states that the party killing
     must act under the influence of such fears alone, is a correct
7    statement of the law." (*People v. Trevino, supra*, 200 Cal.App.3d at
     pp. 878–879; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1045
8    [discussing " 'such fears alone' " analysis in *People v. Trevino* with
     approval].)
9
         However, this does not "imply that a person who feels anger or
10   even hatred toward the person killed, may never justifiably use
     deadly force in self-defense. For example, it is settled that a person
11   who has sought combat may decline further struggle and, if he
     really and in good faith does so before the killing, the killing may
12   be justified on the same grounds as if that person had not originally
     been the aggressor. [Citation.] Furthermore, if a victim of a simple
13   assault engages in a sudden and deadly counterassault, the original
     aggressor need not attempt to withdraw, and may reasonably use
14   necessary force in self-defense. [Citation.] [¶] In such situations, as
     in others, it would be unreasonable to require an absence of any
15   feeling other than fear, before the homicide could be considered
     justifiable. Such a requirement is not a part of the law, nor is it a
16   part of CALJIC No. 5.12. Instead, the law requires that the party
     killing *act* out of fear alone." (*People v. Trevino, supra*, 200
17   Cal.App.3d at p. 879.) "The party killing is not precluded from
     feeling anger or other emotions save and except fear; however,
18   those other emotions cannot be causal factors in his decision to use
     deadly force. If they are, the homicide cannot be justified on a
19   theory of self-defense. But if the only causation of the killing was
     the reasonable fear that there was imminent danger of death or great
20   bodily injury, then the use of deadly force in self-defense is proper,
     regardless of what other emotions the party who kills may have
21   been feeling but not acting upon." (*Ibid.*)

22       "A trial court has no sua sponte duty to revise or improve upon an
     accurate statement of law without a request from counsel" (*People
23   v. Lee* (2011) 51 Cal.4th 620, 638) and the trial court's instruction
     to the jury pursuant to CALCRIM No. 505 accurately and
24   adequately advised the jury of the requirements, relevant to
     defendant's claim here, that he "reasonably believed that he was in
25   imminent danger of being killed or suffering great bodily injury or
     was in imminent danger of being raped," that he "reasonably
26   believed that the immediate use of deadly force was necessary to
     defend against that danger," and that he "acted only because of that
27   belief." The prosecutor did not suggest to the jury that defendant
     was precluded under the law from feeling any emotion other than
28   fear. Rather, based on defendant's testimony regarding his feeling

of anger, the prosecutor's argument that defendant *acted* out of anger rather than fear was proper commentary on the evidence.

### d.  Decision in *People v. Young* Inapt

Lastly, defendant's reliance on *People v. Young* (1963) 214 Cal.App.2d 641 for the proposition that prejudicial error occurred is misplaced. In *People v. Young*, the defendant and the victim were having coffee together at a café when the victim, who had a reputation as a "quarrelsome trouble maker," grabbed the defendant's cash, the sum of which was the defendant's employment pay. (*Id.* at p. 646.) The two men proceeded to engage in a protracted physical altercation during which they were both armed with knives. (*Id.* at pp. 646–647.) The altercation ultimately ended outside the café with the victim dead from multiple stab wounds. (*Id.* at pp. 649–650.)

The defense theory was that the defendant acted in self-defense while resisting the victim's attempt to commit robbery. (*People v. Young, supra*, 214 Cal.App.2d at p. 644.) The trial court refused the defendant's request to instruct the jury regarding this theory (*id.* at pp. 643–644), which the Court of Appeal concluded was error because if believed, the defense evidence "established the basis for a justifiable homicide provided he did not indulge in more force than necessary to recapture his money" (*id.* at p. 649). The appellate court held that in light of the conflicting evidence concerning who inflicted the victim's fatal wound and how, coupled with the trial court's refusal to instruct the jury on the defense theory, defendant was deprived of a fair trial, resulting in a miscarriage of justice. (*Id.* at p. 650.)

In this case, the question of who inflicted the victims' injuries and how was not at issue and, critically, defendant was not precluded from presenting his defense theory to the jury through the absence of jury instructions or otherwise. Accordingly, we find the decision in *People v. Young* inapt and conclude the trial court did not err in its instruction to the jury pursuant to CALCRIM No. 505.

(Doc. No. 24-18 at 21-31 (footnotes omitted)).

### 2.  Analysis

In support of ground two, Petitioner argues "[r]ape being omitted from the imperfect self-defense instruction rendered the defense all but unavailable in this case and violated [his] state and federal constitutional rights to accurate [instructions] on all elements of the offense and all defenses."  (Doc. No. 1 at 7).  As to ground three, Petitioner argues the trial court advised the jury he "could rely on self-defense only if no other factors contributed to the homicide even though California defendants for 140 years have been entitled to rely on self-defense while resisting rape, regardless of whether there may have been other motives

1  for defendant's actions as well." (*Id.* at 8). However, Petitioner again wholly fails to engage

2  with the state appellate court's decision on these claims or present any argument as to why

3  the state court's decision was contrary to, or an unreasonable application of, Supreme Court

4  precedent or based on an unreasonable application of the fact. This failure is especially

5  problematic here, where, as Respondent asserts, the state court's rejection of Petitioner's

6  instructional error claim turned on state law and cannot be the basis of federal habeas relief.

7  *See Estelle v. McGuire*, 502 U.S. 62. 72 (1991) ("[T]he fact that the instruction was allegedly

8  incorrect under state law is not a basis for habeas relief.").

9         To the extent Petitioner brings an instructional error claim based on federal law, such

10  a claim fails. "A court reviewing a claim of jury instructional error on federal habeas review

11  first considers whether the erroneous instruction amounts to a constitutional error." *Reno v.*

12  *Davis*, 46 F.4th 821, 841 (9th Cir. 2022). Importantly, while "the State must prove every

13  element of the offense, and a jury instruction violates due process if it fails to give effect to

14  that requirement," "not every ambiguity, inconsistency, or deficiency in a jury instruction

15  rises to the level of a due process violation." *Dixon v. Williams*, 750 F.3d 1027, 1032 (9th

16  Cir. 2014) (citing *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). Rather, "[a]

17  constitutional error is established where the ailing instruction by itself so infected the entire

18  trial that the resulting conviction violates due process." *Reno*, 46 F.4th at 841 (quotations

19  omitted). The challenged instructions "may not be judged in artificial isolation, but must be

20  viewed in the context of the overall charge." *Dixon*, 750 F.3d at 1033. Even where a

21  constitutional error occurred, relief is not warranted unless "the erroneous instruction had a

22  'substantial and injurious effect or influence in determining the jury's verdict.'" *Reno*, 46

23  F.4th at 841.

24         "California law separates criminal homicide into two classes: the greater offense of

25  murder and the lesser offense of manslaughter. Murder is defined as 'the unlawful killing of

26  a human being with malice aforethought,' while manslaughter is defined as 'the unlawful

27  killing of a human being without malice.'" *People v. Schuller*, 15 Cal.5th 237, 252 (2023)

28  (citations and alterations omitted). When an individual "kills in 'unreasonable self-

defense'—the unreasonable but good faith belief in having to act in self-defense," also referred to as "imperfect self-defense," the malice element is negated because the "most culpable of mental states 'cannot coexist' with an actual belief that the legal act was necessary to avoid one's own death or serious injury at the victim's hand." *Id.* Thus, "when substantial evidence of imperfect self-defense is present, the malice element of murder requires the People to prove beyond a reasonable doubt not only that the defendant committed an unlawful, intentional killing, but also that the defendant did not kill in an actual but unreasonable belief in the need for self-defense." *Id.* at 254.

Here, the trial court correctly instructed the jury on self-defense and imperfect self-defense under California law. (*See* Doc. No. 24-12 at 137-138). While the court did not mention rape specifically in defining imperfect self-defense, it defined "great bodily injury" as "significant or substantial physical injury, … that is greater than minor or moderate harm." (*Id.* at 138). The state court reasonably concluded the combination of this definition with Petitioner's testimony that he acted in fear of being raped again was sufficient to instruct the jury on imperfect self-defense.

Further, any error in the jury instructions did not have a substantial and injurious effect on the verdict. Notably, the trial court instructed the jury that "[i]f you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree." (Doc. 24-12 at 139). The court then advised the jury that for Petitioner to be guilty of first-degree murder, the prosecution must have proven that he acted willfully, deliberately, and with premeditation. (*Id.*). The trial court defined each of these elements: "The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death." (*Id.*). Thus, as the state appellate court concluded, the jury's ultimate finding of first degree murder indicates the jury completed rejected Petitioner's assertion that he acted out of fear. Said another way, if the jury believed Petitioner's version of events but found his fear

1  unreasonable, they would have returned a verdict of *second* rather than *first* degree murder.

2  The jury's first degree murder findings reflect its conclusions that Petitioner acted willfully,

3  deliberately, and with premeditation such that any error in the instructions regarding self-

4  defense did not impact the verdict.

5         Based on the foregoing, Petitioner cannot show that the state court's rejection of his

6  ineffective assistance claims was contrary to, or an unreasonable application of, clearly

7  established Supreme Court precedent, nor that it was based on an unreasonable determination

8  of the facts.  The undersigned recommends that grounds two and three be denied.

9         **C.**        **Ground Four-Cumulative Error**

10         In his fourth ground, Petitioner argues "[r]eversal is required because the errors outlined

11  [in the Petition] even if harmless individually, cumulated to deprive [him] of his right to a fair

12  trial." (Doc. No. 20 at 10).

13         **1.  State Court Decision**

14         In rejecting Petitioner's cumulative error claim, the Fifth Appellate District court found as

15  follows:

16              Defendant also claims cumulative error resulting from the
aforementioned errors. "In examining a claim of cumulative error,

17              the critical question is whether [the] defendant received due process
and a fair trial. [Citation.] A predicate to a claim of cumulative

18              error is a finding of error." (*People v. Sedillo* (2015) 235
Cal.App.4th 1037, 1068.) With the possible exception of
defendant's *Doyle* error claim, which we found harmless in any

19              event, we rejected defendant's individual claims of error and
therefore, we necessarily reject his claim of cumulative error.

20              (*People v. Williams* (2013) 56 Cal.4th 165, 201, disapproved on
another ground by *People v. Elizalde* (2015) 61 Cal.4th 523, 538,

21              fn. 9; *People v. Sedillo, supra*, at p. 1068; *People v. Leeds* (2015)
240 Cal.App.4th 822, 837.)

22

23  (Doc. 24-18 at 31).

24         **2.  Analysis**

25         Petitioner argues reversal is warranted based on cumulative error because his defense

26  depended "almost entirely on his credibility;" the prosecutor destroyed Petitioner's credibility

27  when he "repeatedly impeached [Petitioner] for invoking his constitutional rights;" and any

28  remaining defense was "undermined even further by erroneous instruction on perfect and

1    imperfect self-defense." (Doc. No. 20 at 10). However, as with all of Petitioner's claims, he fails

2    to present any argument engaging with the state court's analysis to establish why the rejection of

3    his claim was contrary to, or an unreasonable application of, Supreme Court precedent or based

4    on an unreasonable determination of the facts.

5        "Cumulative error applies where, although no single trial error examined in isolation is

6    sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

7    prejudice[d] a defendant." *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal

8    quotations and citations omitted). The cumulative error, however, "must render the trial and

9    sentencing fundamentally unfair." *Id.* (citations omitted). Absent a finding of any error on any of

10   the proceeding grounds, the Court cannot find cumulative error. *Williams v. Filson*, 908 F.3d

11   546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors"); *see also*

12   *McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021).

13       Because the undersigned finds none of Petitioner's preceding claims have merit, the

14   undersigned concludes Petitioner cannot show his conviction was fundamentally unfair nor a

15   "unique symmetry" of harmless errors that "amplify each other in relation to a key contested issue

16   in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011). Thus, ground four is

17   without merit and should be denied.

18       **V. CERTIFICATE OF APPEALABIILTY**

19       A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

20   court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;

21   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a

22   district court to issue or deny a certificate of appealability when entering a final order adverse to a

23   petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

24   Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial

25   showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires

26   the petitioner to show that "jurists of reason could disagree with the district court's resolution of

27   his constitutional claims or that jurists could conclude the issues presented are adequate to

28   deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

1   *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

2   the denial of a constitutional right, the undersigned recommends that the court decline to issue a

3   certificate of appealability.

4           Accordingly, it is **RECOMMENDED**:

5       1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

6           20); and

7       2.  Petitioner be denied a certificate of appealability.

8                               **NOTICE TO PARTIES**

9           These Findings and Recommendations will be submitted to the United States District

10  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

11  after being served with a copy of these Findings and Recommendations, a party may file written

12  objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

13  "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

14  **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

15  wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

16  CM/ECF document and page number, when possible, or otherwise reference the exhibit with

17  specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

18  the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

19  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

20  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

21

22  Dated:    May 28, 2025

23                                          HELENA M. BARCH-KUCHTA
                                            UNITED STATES MAGISTRATE JUDGE
24

25

26

27

28